SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CARBON CAPITAL II, INC., a Maryland  :
corporation,           : Index No. 600984/08
               :
     Plaintiff,      :
               : **SUPPLEMENTAL AFFIDAVIT OF**
    - against -     : **FRANCIS P. POMAR IN SUPPORT**
               : **OF MOTION OF PLAINTIFF**
ROYAL PALM SENIOR INVESTORS, LLC, a : **CARBON CAPITAL II, INC. FOR**
Delaware limited liability company, and GUY T. : **A PRELIMINARY INJUNCTION**
MITCHELL, an individual,      :
               :
     Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK  )
           ) ss.:
COUNTY OF NEW YORK )

   Francis P. Pomar, first being duly sworn, hereby deposes and says:

   1. I am a Managing Director of Blackrock, Inc. which is affiliated with plaintiff Carbon

Capital II, Inc. ("Carbon II" or "Plaintiff"). I am an authorized representative of Carbon II and

submit this supplemental affidavit in support of Plaintiff's Motion for a Preliminary Injunction

against defendants Royal Palm Senior Investors, LLC ("Royal Palm") and Guy T. Mitchell

("Mitchell," and together with Royal Palm, "Defendants").

   2. I have personal knowledge of the matters set forth herein based upon my experience

in the monitoring of loan performance and asset management of defaulted loans. I have

monitored the Royal Palm loan since its origination.

   3. I refer to and incorporate by reference my original affidavit, sworn to on April 7,

2008 ("Original Affidavit"), which was filed with the Court on April 8, 2008, and am providing

this supplemental affidavit to make the Court aware of the additional facts set forth below, which

may assist the Court in rendering its decision.

## ADDITIONAL FACTS

4.  On the evening of March 31, 2008, Mr. Mitchell executed a letter of agreement ("Letter of Agreement") with a certain sales broker, Eastdil Secured ("Eastdil"), which provides that Eastdil shall have the exclusive right to sell the Royal Palm Hotel through and including September 15, 2008. A true and correct copy of the Letter of Agreement is attached hereto as Exhibit A. Mitchell took this action despite the fact that Defendants had no intention or ability to either pay Carbon II the outstanding principal, interest and fees set forth in the Settlement Agreement, or cause the sale of the Royal Palm Hotel, or refinance the Loan,[1] **and** despite the fact that 99.9% of Royal Palm's membership interest in the Royal Palm Hotel was indisputably about to be automatically conveyed to Carbon II, **and** without the consent of Carbon II.

5.  As set forth in the Loan Agreement, any effort by Royal Palm to pay to Carbon II the outstanding principal, interest and fees set forth in the Settlement Agreement, or cause the sale of the Royal Palm Hotel, or refinance the Loan would have to be completed by March 31, 2008. (Original Affidavit, Ex. B at § 3.1.) Otherwise, Royal Palm's rights as managing member of the Royal Palm Hotel, which would include Royal Palm's right to bind the Royal Palm Hotel to the Letter of Agreement, would cease and automatically transfer to Carbon II. (Original Affidavit, Ex. B. at § 3.1.) The Letter of Agreement contains facsimile confirmation lines indicating that it was faxed between the parties on March 31, 2008 at 8:45 p.m. and, again, at 9:17 p.m. (Ex. A at 1.)

6.  I did not learn about the Letter of Agreement until on or about April 11, 2008.

7.  On or about April 3, 2008, a colleague and I attempted to contact Eastdil. However, Eastdil refused to speak with us, expressing concern that it could be found liable for speaking

---

[1] Capitalized terms used but not defined herein shall have the meaning set forth in the Original Affidavit.

with Carbon II because, according to its incorrect understanding, Carbon II is not the owner or party with responsibility for the Royal Palm Hotel.

8.  On April 9, 2008, the Miami Herald published an article entitled *Royal Palm Hotel Faces Ownership Change*, which concerns this litigation, and which states that the dispute concerns a request to a "New York judge to force owner Guy Mitchell to surrender management" of the Royal Palm Hotel.  Even though Carbon II is the managing member of the Royal Palm Hotel, the article suggests that Defendant Mitchell is the manager/owner.  A copy of the Miami Herald article, April 9, 2008, is attached hereto as Exhibit B.

9.  Also on April 9, 2008, I went to the Royal Palm Hotel, and attempted to speak with Naveen Ahuja, who was hired by Defendants to serve as the general manager of the Royal Palm Hotel.  I informed Mr. Ahuja that, by agreement, Carbon II is now the managing member of the Royal Palm Hotel, and requested his assistance in transitioning the management of the Royal Palm Hotel to Carbon II, and asked for copies of, among other things, any licenses for and accounting records of the Royal Palm Hotel.  Mr. Ahuja informed me that he needed to speak first with Defendant Mitchell's attorneys, stepped out for approximately ten minutes, and returned to tell me that he was informed by Defendant Mitchell's attorneys that he was not authorized to speak with me, and walked away.

10. Additionally on April 11, 2008, during a meeting with Eastdil, Eastdil informed me that it would not market the Royal Palm Hotel for sale without an agreement between Defendants and Carbon II.

11. On April 10, 2008, Eastdil informed me by electronic mail that it would be unable to market the Royal Palm Hotel for sale while this litigation is pending, and further requested an agreement between Defendants and Carbon II.  A true and correct copy of the electronic mail exchange with Eastdil is attached hereto as Exhibit C.

12. On April 15, 2008, the Miami Herald published another article about this litigation, entitled *Dream Hotel Faces Bad Day At Blackrock*, which states that due to Defendant Mitchell's failure to pay "a $25 million debt and a failed attempt to market the Royal Palm as a condo-hotel," Carbon II "wants to take control of the hotel." Even though, by agreement, Carbon II is the managing member of the Royal Palm Hotel, the article clearly suggests that Defendant Mitchell is the manager. A copy of the Miami Herald article, dated April 15, 2008, is attached hereto as Exhibit D.

13. On or about April 15, 2008, I reviewed the Miami-Dade County, Real Estate Tax Information website (miamidade.gov) and determined that the real estate taxes for the Royal Palm Hotel for the year 2007, which were due on April 1, 2008, had not been paid. A copy of the relevant Miami-Date County, Real Tax Information website is attached hereto as Exhibit E.

14. Carbon II is prepared to pay any outstanding taxes owed by the Royal Palm Hotel, but Defendants are preventing Carbon II from making any such payment by denying Carbon II access to the books, records and accounts of the Royal Palm Hotel.

15. Likewise, on or about April 16, 2008, I learned from a representative of Wachovia, the senior lender to the Royal Palm Hotel, that Defendants had failed to pay the monthly debt service payment that was due under the loan agreement between the Royal Palm Hotel and Wachovia for the month of April, 2008.

16. Carbon II is prepared to make any outstanding loan payments owed to the senior lender by the Royal Palm Hotel, but Defendants are preventing Carbon II from making any such payment by denying Carbon II access to the books, records and accounts of the Royal Palm Hotel.

17. Similarly, per oral reports that I have received from the controller of the Royal Palm Hotel, the Royal Palm Hotel has $2.8 million in unpaid accounts payable, which are overdue. In

addition, per a title search on the property conducted on April 7, 2008, the entities listed below have filed liens against the property and, to my knowledge, none of the liens have been removed as of the date of this affidavit:

(a) Shakman Hospitality, in the amount of $35,300, dated April 2, 2007

(b) Shakman Hospitality, in the amount of $65,000, dated April 2, 2007

(c) Jhonny Prado Tile, in the amount of $137,406.21, dated April 2, 2007

(d) Landmark Services Company of Florida, LLC, in the amount of $149,969.82, dated April 30, 2007

(e) Julian Prado Painting, Inc., in the amount of $115,386.57, dated May 5, 2007

(f) American Glass & Window, Inc., in the amount of $38,971, dated May 8, 2007

(g) One Step Express Corporation, in the amount of $10,237.50, dated August 1, 2007

(h) Carpet Service International, Inc., in the amount of $74,239.86, dated August 2, 2007

(i) Renaissance Hospitality, New, in the amount of $199,688, dated September 6, 2007

18. Moreover, on or about April 15, 2008, I learned that numerous lis pendens recently have been filed against the Royal Palm Hotel, including the following:

(a) Unpaid Taxes for 2004 (dated December 8, 2005), 2005 (dated November 16, 2006) and 2006 (dated November 19, 2007)

(b) Julian Prado Painting, Inc., dated January 31, 2008

(c) Jhonny Prado Tile, Inc., dated January 31, 2008

(d) Shakman Hospitality (for Maxim Lounge @ Royal Palm Hotel, pursuant to contract under which items were first furnished on September 11, 2006), dated February 20, 2008

(e) Shakman Hospitality (for Maxim Lounge @ Royal Palm Hotel, pursuant to contract under which items were first furnished on February 1, 2006), dated February 20, 2008

The above liens and lis pendens evidence the fact that Defendants are improperly managing the

Royal Palm Hotel and are willingly allowing the property to deteriorate in value.

19. Defendants' actions unquestionably violate the rights of Carbon II under the Settlement Agreement and are interfering with Carbon II's efforts to prepare the Royal Palm Hotel for sale. Indeed, as evidenced by the articles in the Miami Herald, Defendants actions are creating confusion in the market. Moreover, as evidenced by their failure to make the debt service payment due to Wachovia on April 15, 2008, and the liens and lis pendens described above, Defendants apparently do not have the intent or financial ability to maintain the Royal Palm Hotel, and therefore, the property is at serious risk of severe deterioration. If a preliminary injunction is not entered to prevent Defendants from continuing to hold Royal Palm out as the managing member of the Royal Palm Hotel, Defendants will continue to violate Carbon II's rights, will continue to interfere with the sale process, and will continue to place the property in serious risk of deterioration.

_____
Francis P. Pomar

Sworn to before me this 16th day
of April, 2008

_____
Notary Public

STEPHANIE TALBOTT
Notary Public, State of New York
No. 01TA6146903
Qualified in Westchester County
Commission Expires May 30, 2010



**EASTDIL SECURED**

1750 H STREET, NW, SUITE 550
WASHINGTON D.C. 20006
TEL 202 478 0600 FAX 202 429 2940

March 31, 2008

Guy Mitchell
The Mitchell Companies
P.O. Box 56-5335
Pinecrest, Florida 33256

Re:    The Royal Palm Hotel
       Miami Beach, Florida

Dear Guy:

        The purpose of this letter is to describe the terms and conditions under which Eastdil Secured, L.L.C. (the "Broker") is authorized to arrange the sale of the Royal Palm Hotel located in Miami Beach, Florida (the "Property") on behalf of Royal Palm Hotel Property LLC (the "Owner"). For the purposes of this agreement the term sale shall include a disposition of the entire Property, a portion of the Property, and/or a partial interest in the Property.

        1.      **Grant.** The Owner hereby grants to Broker the exclusive right to sell the Property for a period commencing on the date hereof and continuing through and including September 15, 2008 (the "Exclusive Period").

        Notwithstanding the foregoing, Owner reserves the right to terminate this Agreement in its entirety upon written notice to Broker in the event Broker is in material breach of any of its obligations hereunder and Broker fails to cure any such breach remains within ten days of receipt of notice from Owner as to the existence of such breach. Owner may also terminate this Agreement in the event Owner withdraws the Property from the market. Owner and Broker agree that any such termination of this Agreement by Owner shall be subject to the terms of Sections 2 and 3.

        2.      **Compensation.** Owner agrees to pay Broker, and Broker agrees to accept from Owner, compensation for arranging the sale of the Property in an amount equal to .70% of the first $205,000,000 of Gross Sale Price (as defined below) of the Property; 1.25% of the next $10,000,000 (up to a Gross Sales Price of $215,000,000); and 2% of the portion (if any) of the Gross Sale Price of the Property that exceeds $215,000,000.00. Gross Sale Price shall include without limitation, any cash consideration paid or payable in connection with a sale, the then outstanding principal balances of any mortgages or deeds of trust constituting a lien on the

*417320.5*

Property assumed, or to which the Property is taken subject, by the purchaser, the face amount of any purchase money mortgage or deed of trust taken back by the Owner and the fair market value of all other consideration payable in connection with the sale of the Property, without deduction for closing expenses, adjustments or costs of any kind. For purposes of calculating fair market value, any securities constituting a part of such consideration that are publicly traded shall be valued at the last closing price thereof (or, if applicable, the mean between the latest bid and asked prices) prior to the date of the consummation of the acquisition; non-publicly traded securities or other assets shall be valued at their fair market value as determined by agreement among the parties hereto. As used in this Section, the term "Sales Price" shall mean the price specified in a binding agreement executed and delivered by Owner and the purchaser, and shall be reduced by any adjustment to such price made in accordance with such agreement including but not limited to price adjustments for any capital expenditures incurred by Owner as a condition of closing or escrow of funds by Owner for the benefit of the purchaser but such price adjustment(s) shall exclude any prorations and closing costs or charges to be made or paid by the parties.

The compensation contemplated herein shall be earned by and payable to Broker as, if and when the closing of the sale occurs. Broker, in all events, shall be entitled to the aforesaid compensation if the Owner consummates the sale of the Property during the Exclusive Period, or signs a written agreement for the sale of the Property that closes subsequent to the end of the Exclusive Period as described below. Owner may reject any proposed offer in its sole discretion or fail to reach agreement with respect to any proposed sale and no commission shall be payable to Broker on account thereof.

Notwithstanding anything contained herein to the contrary, (i) if the Property shall be sold to Hyatt Equities, LLC or an entity owned or controlled by Hyatt, Broker shall be paid a commission in an amount equal to .50% of the Gross Sales Price; and (ii) if Owner shall enter into a purchase and sale agreement with either Hawkstone Holdings or Leisure Holdings prior to Broker "entering to market," then if such sale to Hawkstone Holdings or Leisure Holdings closes, Broker shall be entitled to a commission in an amount equal to .35% of the Gross Sales Price at time of closing. The term "entering to market" shall mean (a) the approval by Owner of Broker's proposed marketing materials and (b) initial dissemination by Broker of preliminary marketing information to the public by way of an "eteaser".

If the Owner should enter into a written agreement for the sale of the Property before the termination of the Exclusive Period, but the closing does not occur until after the termination of such period, Broker shall be entitled to be paid the compensation in accordance with the terms of this agreement whenever the closing contemplated by such sale agreements occurs.

Broker shall deliver to Owner, within five business days, after the earlier of the expiration of the Exclusive Period or the termination of this Agreement (such date, the "List Date") a written list of persons and entities that have both (a) either received offering materials or toured the Property and (b) with whom Broker had substantive negotiations during the term of this Agreement (the "Active Prospect List"), and provided such Active Prospect List is delivered to Owner on or before the List Date and a sale of the Property is consummated within 6 months after the List Date, the Broker shall nevertheless be entitled to its full commission if the

417320.5                                    2

MAR-31-2008 21:18 From:                                To:202 429 2940                 P.3/7

purchaser is a party, or an affiliate or subsidiary, who was specifically identified by Broker to Owner on the Active Prospect List. If the Active Prospect List is not delivered on or before the List Date, Broker shall have no right to any commission based on the provisions of this Section and nor right to bring any action or claim for any such commission based on the provisions of this Section unless Owner shall have entered in a contract of sale for the Property prior to the List Date, and such sale transaction is subsequently consummated as contemplated by the previous paragraph.

Notwithstanding anything contained herein to the contrary, if a sale of the Property should not close solely due to the Owner's willful default in any of its obligations under any contract that may be signed for the sale of the Property, Broker shall be entitled to the compensation set forth in this agreement on the date of such default, provided that Broker would have been entitled to receive the compensation provided in this agreement if the sale of the Property had actually closed on such date.

3.    **Expenses**. In all events, Broker shall be entitled to reimbursement for its out-of-pocket expenses, including travel and other costs incurred in the preparation of marketing materials (e.g., photography, cartography, graphic arts, reproductions, printing, etc.) provided, however, that Owner shall have no obligation to reimburse Broker for that portion of any such expenses that is in excess of $75,000.00. Owner shall promptly reimburse Broker from time to time for any such expenses incurred upon Owner's receipt of an invoice from Broker which invoice shall be sent (i) following preparation of marketing materials and (ii) either upon consummation of a closing of the sale of the Property or upon expiration of the Exclusive Period. To the extent that the Owner requests Broker to provide due diligence materials to prospective purchasers, Owner will directly pay, or reimburse Broker, for all costs incurred in copying and distributing said material. These costs shall be subject to the "cap" on any expenses set forth above. If Owner requests changes be made in the marketing materials, or that the overall marketing plan is changed after final approval of said material by the Owner and production of the materials commences, any costs incurred in making such changes shall be paid directly, or reimbursed to Broker, by Owner. These costs are in addition to any other costs incurred by Broker and not subject to the "cap" on any expenses set forth above. Any and all marketing materials prepared by or on behalf of Broker in connection with Broker's performance under this Agreement including without limitation, brochures, offering memoranda flyers, photographs, negatives, artwork and graphics, shall become the property of Owner after Owner makes reimbursement as contemplated herein, provided Owner shall not use any such material without deleting any and all references to Broker that may be contained therein. So long as Broker complies with the foregoing, Broker shall have no rights to the materials prepared for Owner. Upon reimbursement as provided above, Broker shall deliver to Owner all remaining, undistributed marketing materials at the expiration of the Exclusive Period hereunder. In the event Broker shall be entitled to the payment of a commission, any and all expenses advanced by Owner to Broker shall be deducted from the commission payable to Broker hereunder.

4.    **Green Street Advisors**. The parties hereby acknowledge that in addition to Broker's services hereunder, Broker may utilize the services of Green Street Advisors, and together they will consult with Owner and one another regarding the development of a target investor list, evaluation of purchase offers and the offerors, and, if stock or other equity is

*117320.5*                                           3

offered, evaluation of such securities. Therefore, Broker is hereby authorized to share any confidential information provided with Green Street Advisors, and when appropriate include Green Street Advisors in meetings with prospective purchasers provided that Green Street Advisors agrees to keep all information received from Owner or its agents confidential. Regardless of whether or not Broker employs Green Street Advisors or any co-broker or co-brokers no more than one full commission at the rates set forth in Section 6, shall be payable and the commission shall be paid only to Broker.

     5.    **Information**. The Owner shall make available to Broker the documents and other information which in the reasonable judgment of Broker are necessary or appropriate for the fulfillment of its assignment hereunder and the proper marketing of the Property. All documents and information supplied to Broker by the Owner shall, to the best of the Owner's knowledge, be complete and accurate and the Owner shall correct any information which it learns is incomplete or inaccurate. The Owner may designate certain information as confidential, and Broker will so treat such information. The Owner understands that the information provided to Broker may be used in the preparation of marketing materials that will be distributed to prospective purchasers. The Owner will be asked to approve all marketing materials in advance of their use. The Owner acknowledges and agrees that, as between Broker and the Owner, the Owner is responsible for the accuracy and completeness of all information regarding the Property that is provided by or at the direction of the Owner. Additionally, Owner agrees to provide to Broker a copy of the final form of the closing or settlement statement(s) prepared in connection with the closing and settlement of the sale transaction(s).

     6.    **Analysis**. To the extent that Broker prepares any analysis, valuation, appraisal or other report ("Analysis") regarding the economic value of the Property or Owner's interest therein, Owner acknowledges and agrees that any such Analysis will be an estimate only and will not constitute a representation, warranty, covenant or guaranty, either expressed or implied, regarding future events or performance. The Owner represents that the Analysis will be used for its internal purposes only, and will not be disseminated to any third party without the written consent of Broker.

     7.    **Broker's Duties**. Broker shall use its reasonable best efforts, skills and services and those of its organization committing the team of Miles Spencer supported by other personnel and resources of the firm to procure a purchaser. Miles Spencer will have primary responsibility for managing and executing this marketing engagement. At all times during the term of this Agreement, Broker shall diligently investigate and develop all offers and inquiries and canvass, solicit and take such other actions as may be appropriate to bring about a sale of the Property. Without limiting the foregoing, Broker shall:

     (i)    perform due diligence on the Property, including without limitation, reading and summarizing, where appropriate all leases, service contracts, leasing commission agreements (including a schedule of outstanding or contingent obligations) and historical financial data and review survey, title, policy/commitment, management reports, budgets and similar material and all physical plant and environmental reports provided to Broker by Owner, provided Owner acknowledges that Broker is neither a lawyer, engineer or architect and shall not be held to the standards of any such professionals;

*117320 5*

4

(ii)    prepare valuations of the Property, including internal value and marketing versions and review it with Owner, which valuations shall be subject to the provisions of Section 6 herein;

(iii)    prepare and submit to Owner for its approval, a confidentiality and limiting conditions statement based on Owner's standard form to be included in brochures, offering memorandums and other marketing materials and in any event, obtain fully executed registration forms from prospective purchasers and brokers substantially in the form provided by Owner prior to disseminating detailed property information (e.g. offering memorandum);

(iv)    prepare a marketing strategy and a target prospect list and deliver them to Owner within 15 business days of the date hereof, such target prospect list to include, at a minimum, the name, company, type of company/investor, line of business, city and state of each budget prospect and stating whether such target prospect is a broker or a principal;

(v)    prepare marketing materials and proposals including an offering memorandum and form correspondence and deliver drafts thereof to Owner within 20 business days of the date hereof, for Owner's review and approval;

(vi)    upon Owner's approval of the registration form, the brochure related materials, pricing, marketing strategy and prospect list, commence marketing and solicitation of interest and offers;

(vii)    coordinate walk-through property inspections (provided that no detailed or intrusive physical inspections shall be made without Owner's prior written consent and, in any event, only after Owner receives an indemnity and insurance certificates, satisfactory to Owner in form and substance) and information requests for prospective purchasers;

(viii)    endeavor to generate offers and provide available supporting information on any offerors' business reputation, relevant acquisition history, source of funds and sense of knowledge about the Property and its market;

(ix)    assist with or coordinate, as requested by Owner (a) the purchaser's due diligence on the Property, including without limitation, review/preparation of files, provision of materials to purchaser, and arranging inspections, and (b) closing details, if any, including without limitation (i) collection of information necessary for preparation of contract exhibits and review of such exhibits, and (ii) assistance with preparations for closing; and

(x)    upon selection of a purchaser, provide Owner with a clean set of copies of (i) form correspondence provided to prospects in the marketing campaign/bid process (e.g. introductory letters, update letters, call for offers, bid letters, etc.) and (ii) summary/summaries of offers prepared by Broker.

Offering memoranda and other detailed property information will only be provided once a prospect is registered and has signed a confidentiality agreement substantially in form and substance approved by Owner.

8.    **Reporting.** Broker shall keep the Owner current as to the progress of its marketing efforts and the Owner shall refer promptly to Broker all inquiries concerning the Property. To the extent that Owner fails to refer any such inquiry to Broker, or prevents or requests Broker to refrain from contacting, or delivering a marketing brochure to any such party, such party shall be deemed to be a party with whom Broker dealt for all purposes of this agreement. The Owner shall provide Broker, within 15 days of executing this agreement, a list of the names of all parties with whom the Owner had discussed the sale of the Property prior to the date hereof.

9.    **Owner's Authority.** The Owner, in its sole discretion, reserves its right to accept or reject any offer for the acquisition of the Property.

10.    **Purchaser Representation.** Owner acknowledges and agrees that the potential purchaser of the Property may request Broker to act as its financial advisor to arrange financing for the purchase of the Property.  Owner agrees that Broker may assist such purchaser in arranging financing to complete the acquisition of the Property and that Broker may be paid a fee by such purchaser for arranging any such financing and such fee shall in no event reduce, or be credited against, any fee payable hereunder.

11.    **Local Broker.** Notwithstanding anything contained herein to the contrary, Broker, in its sole discretion and at its sole cost and expense, may engage the services of a local representative in any such state where such local representative may be necessary to comply with local real estate brokerage licensing laws. Each local representative, if any, shall perform such limited services as Broker, in its sole discretion, may determine are necessary or appropriate to comply with such local laws.  Owner shall not be responsible for any commission or fee payable to such local representative.

12.    **Attorney's Fees.** In the event that any action, suit or other proceeding in law or in equity is brought in connection with any term or provision in this agreement, and such action results in the award of a judgment for money damages or in the granting of any injunction or restraining order, all expenses (including reasonable attorneys' fees) of the prevailing party in such action, suit or other proceeding shall be paid promptly by the non-prevailing party.

13.    **Limitations.** The Owner also understands that Broker will not advise it as to the legal or tax effects of any transaction, and that the Owner should, if it has not done so already, promptly engage legal and tax professionals to advise it as to all such matters during the course of this engagement and any transaction that may result. Broker shall also have no obligation to investigate conditions on or the condition of the Property, nor the financial stability or capability of any prospective purchaser. The Owner should engage technical staff and other analytical personnel to advise and assist it in each of these areas.

*417320.5*                                    6

14.    **Assignment**. Except as provided in Paragraph 11 above, neither party shall assign this agreement or any right or obligation hereunder without the prior written consent of the other party.

15.    **Arbitration**. Any claim or dispute arising out of or in any way relating to this agreement or its alleged breach shall be determined in a binding arbitration by a single arbitrator that is a retired State or Federal court judge. The arbitration shall be administered by the American Arbitration Association under its commercial dispute resolution procedures which are in effect at the time of the arbitration. The arbitration shall take place in New York City. The parties may seek, from a court of competent jurisdiction, provisional remedies or injunctive relief in support of their respective rights and remedies hereunder without waiving their right to arbitration. However, the merits of the action that involves such provisional remedies or injunctive relief, including without limitation, the terms of any permanent injunction, shall be determined by arbitration under this section. Judgment on the arbitrator's award may be entered in any court of competent jurisdiction.

16.    **Miscellaneous**. The party executing this agreement on behalf of the Owner and the party executing this agreement on behalf of Broker each represent and warrant that he is duly authorized to bind the Owner or the Broker, as applicable, with respect to the terms and conditions of this agreement. This agreement may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same agreement.

This agreement contains the entire agreement of the parties hereto and replaces any prior agreements or understandings with respect to the subject matter hereof. It may not be changed, amended or modified except by an instrument in writing signed by the parties hereto.

Provided the terms and conditions of this agreement meet with your approval, please evidence your agreement by executing this letter on behalf of the Owner, and return it to me.

Sincerely,

EASTDIL SECURED, L.L.C.

By: _signature_

Name: Miles Spencer
Title: Managing Director

AGREED AND ACCEPTED:

ROYAL PALM HOTEL PROPERTY, LLC

By: _signature_
Name: _____
Title: _____
Dated: March _31_, 2008

417320.5                                      7

**MiamiHerald.com** 🐟

Posted on Wed, Apr. 09, 2008

# Royal Palm hotel faces ownership change

BY DOUGLAS HANKS
Lenders are trying to take control of the Royal Palm hotel in Miami Beach after accusing its owner of defaulting on a $25 million loan, according to court documents.

A fund with ties to the Blackrock investment giant has asked a New York judge to force owner Guy Mitchell to surrender management of the 417-room oceanfront hotel.

A $25 million loan to the hotel came due on March 31, and Mitchell has been unable to find another lender or a buyer for the hotel, court papers show.

The unfolding drama is the latest saga for the oceanfront resort, one of Miami Beach's largest hotels, which developer R. Donahue Peebles built using city subsidies.

Mitchell backed condo-hotel developer Robert Falor in a failed attempt to sell off a portion of the hotel's rooms as condominiums, a venture that would have meant a windfall of cash.

Mitchell and Falor took out the $25 million loan in 2005 when they bought the hotel for $128 million, with Peebles retaining a 12 percent stake in the property. Mitchell holds the majority stake; Falor owns a small portion of the hotel.

The partnership soured. Peebles sued Mitchell last year, claiming mismanagement. Mitchell then ousted Falor from running the hotel's operations.

Despite its oceanfront location in South Beach, the Royal Palm has struggled financially.

It missed a loan payment in July, and October court filings list $11 million overdue interest and late penalties. During his court fight with Mitchell, Peebles said the hotel lost $12 million in 2006.

Though it opened in 2002 in the Intercontinental chain, the Royal Palm no longer has a national hotel brand on its door -- typically a must for a property of its size. Hyatt was poised to buy the hotel in the fall, but that deal fell through.

With no buyer, Mitchell was left to find another lender amid a credit crisis that has Wall Street leery about taking on more risk.

Mitchell could not be reached Tuesday for comment. A spokesman for Blackrock, a New York company, also was not immediately available for an interview. Peebles declined to comment.

The suit was filed last week by Carbon Capital II, an investment fund managed by Blackrock that holds the loan made to a Mitchell company called Royal Palm Senior Investors.

Carbon Capital said it informed Mitchell that he needed to relinquish control of the hotel under the

terms of the loan, which called for Carbon Capital to take over if the March 31 deadline passed without a buyer or a new loan in place.

A Mitchell lawyer wrote in an April 2 e-mail that Carbon could not take over the Royal Palm, according to the court papers. The stand-off makes it impossible for Blackrock to sell the hotel, which "is in the best interests of the property," the suit says.

---

© 2008 Miami Herald Media Company. All Rights Reserved.
http://www.miamiherald.com

**Navia, Jason**

**Subject:**                     FW: Royal palm


```
-----Original Message-----
From: Larry Wolfe [mailto:LWolfe@eastdilsecured.com]
Sent: Thursday, April 10, 2008 2:13 PM
To: Pomar, Frank
Cc: Miles Spencer
Subject: Re: Royal palm
```

Late morning fri would be good for miles and me Thanks


Lawrence B. Wolfe
Senior Managing Director
Eastdil Secured
40 West 57th Street
New York, New York  10019

ph  212 315 7284
fax 212 315 3602

```
-----Original Message-----
From: Pomar, Frank <Frank.Pomar@blackrock.com>
To: Larry Wolfe
Sent: Thu Apr 10 13:56:46 2008
Subject: RE: Royal palm
```

We would like to sit down.  Pls bring the engagement letter.

What time works for you?

```
-----Original Message-----
From: Larry Wolfe [mailto:LWolfe@eastdilsecured.com]
Sent: Thursday, April 10, 2008 12:35 PM
To: Pomar, Frank
Cc: Miles Spencer
Subject: Royal palm
```

Frank

As you may be aware our firm has been retained by guy mitchell to
represent the owners in the sale of the hotel. Would it be possible for
my colleague and I to meet with you tomorrow to discuss our marketing
plan for the asset?

We need 6 months to sell the hotel in an orderly manner and would ask
for a temporary detente between the parties.

Our job is to act as a strong advocate of the hotel and we believe that
will ultimately maximize recovery for everyone. The transaction markets
are challenging and potentially getting worse. We are prepared to enter
the market monday, but won't be able to do so if there is litigation
between the parties.
A public truce, with both lender and borrower endorsing our sales effort
is our request.

Thanks, let me know if you have a few minutes to meet on fri.

Larry

Lawrence B. Wolfe
Senior Managing Director
Eastdil Secured
40 West 57th Street
New York, New York   10019

ph  212 315 7284
fax 212 315 3602

Securities products offered through Wells Fargo Securities, LLC
---------------------------------------------------------------

Any views or opinions presented are solely those of the author and do
not necessarily represent those of the company unless otherwise
specifically stated. Eastdil Secured offers securities through Wells
Fargo Securities, LLC.  This material is provided for informational
purposes only and should not be used or construed as an offer to sell or
a solicitation of an offer to buy any security.

The company may hold a position in any given security. We reserve the
right to monitor and review the content of all communications sent
and/or received by our employees.

This message may contain confidential and/or privileged information and
is for the named person's use only. If you are not the intended
recipient or have received this email in error, please notify the sender
immediately and delete all copies of it from your system. If you would
prefer not to receive further communications, please contact us by
calling 800-323-0278 x507. Thank you for your cooperation.

THE INFORMATION CONTAINED IN THIS MESSAGE AND ANY ATTACHMENT MAY BE
PRIVILEGED, CONFIDENTIAL, PROPRIETARY OR OTHERWISE PROTECTED FROM
DISCLOSURE. If the reader of this message is not the intended recipient,
you are hereby notified that any dissemination, distribution, copying or
use of this message and any attachment is strictly prohibited. If you
have received this message in error, please notify us immediately by
replying to the message and permanently delete it from your computer and
destroy any printout thereof.

THE INFORMATION CONTAINED IN THIS MESSAGE AND ANY ATTACHMENT MAY BE PRIVILEGED,
CONFIDENTIAL, PROPRIETARY OR OTHERWISE PROTECTED FROM DISCLOSURE. If the reader of this
message is not the intended recipient, you are hereby notified that any dissemination,
distribution, copying or use of this message and any attachment is strictly prohibited. If
you have received this message in error, please notify us immediately by replying to the
message and permanently delete it from your computer and destroy any printout thereof.

MiamiHerald.com 🖨

Posted on Tue, Apr. 15, 2008

# Dream hotel faces bad day at BlackRock

BY FRED GRIMM

The Royal Palm opened in 2002 adorned with the lofty language of a great social experiment. Terms like black dreams, black pride, black hope, black determination echoed off the hotel's soaring Art Deco walls.

The sentiment was so persistent, so sincerely voiced, it was almost as if someone thought it might even be true.

The key phrase in 2002, the one that resonated across South Florida, was "black-owned." A black-owned Miami Beach convention hotel had been the jewel in the 1993 agreement that brought an end to a three-year black tourist boycott.

## ENTER BLACKROCK

Last week, another term was associated with the ownership of the Royal Palm -- BlackRock Inc.

The New York investment firm went to court last week trying to wrest control of the struggling Miami Beach hotel. The lawsuit concerned a $25 million debt and a failed attempt to market the Royal Palm as a condo-hotel.

All that stuff about black enterprise? Long forgotten.

Back in 1990, one of those only-in-South Florida cultural collisions had roiled race relations. Nelson Mandela, on an official visit, had been snubbed by the local political leadership, bothered by the South African president's coziness with Fidel Castro.

Blacks wanted an apology. None came. The boycott was called, churning up lots of unkind national media attention. Black conventions canceled. Damage to the local tourist industry was estimated at $20 million before a settlement was reached three years later.

The key to the deal: The city of Miami Beach would subsidize a black-owned convention hotel. The city would loan the project $10 million in return for a promise of minority ownership and strict minority hiring levels. At least 25 percent of the hotel management had to be minority -- minority meaning blacks, long shut out of the tourist economy.

Nationally syndicated radio host Tony Brown said the Miami Beach deal ``would become what Montgomery, Ala., became when Rosa Parks started the civil rights movement."

## SOLD OUT

But black developer R. Donohue Peebles was not Rosa Parks. Miami Beach was not Montgomery. By 2004, the Royal Palm was not even a black-owned hotel.

Peebles flipped the property. Sold 87.5 percent to a couple of white guys who figured they could make a killing converting the 417-room Royal Palm into a condo hotel. Those hard-fought agreements to insure minority ownership? The requirement to insure minorities in the hotel management? All that went away when the dealmakers paid off the $10 million loan from the city.

The Royal Palm, for all its financial troubles, still looked sparkling Monday with its grand juts and curves and giant portholes and two swimming pools at the foot of the dunes with so many happily oiled tourists on lounge chairs.

But nothing about the place memorized its idealistic origins. I only saw a couple of black employees -- a desk clerk and a maid. Only two black hotel patrons were poolside. I saw none passing through the lobby.

Apparently, the only real accomplishment of the three-year boycott was to make a rich black developer richer still. Peebles has claimed he cleared about $65 million when he sold the great black hope on Miami Beach.

Now some judge in New York must sort out just who owns the debt-plagued Royal Palm. BlackRock, unless it can collect its $25 million note, wants to take control of the hotel.

Aspirations have fallen hard at the Royal Palm: from black-owned to BlackRock.

---

© 2008 Miami Herald Media Company. All Rights Reserved.
http://www.miamiherald.com

Miami-Dade County: Real Estate Tax Information

# miamidade.gov

**Real Estate Tax Information**

**Show Me:**
Property Taxes

**Search By:**
Select Item

**Detail Tax Information:**
Real Estate Tax Info
2007 Taxes
Prior Years Taxes Due
2007 Ad Valorem
2007 Non-Ad Valorem
2007 Back Assessments
2007 Enterprise Folio
2007 Historical Abatements
2008 Quarterly Payments
2007 Tax Notice/Memorandum

## Real Estate Tax Information

**Today's Date:** 04/15/2008 **Last Update:** 04/11/2008

**Tax Year:** 2007

**Folio Number:** 02  3234019O9960  MIAMI BEACH

**Owner's Name:** ROYAL PALM HOTEL PROP LLC % THE FALOR COMPANIES INC

**Property Address:** 1545 COLLINS AVE

**Mailing Information :**
ROYAL PALM HOTEL PROP LLC
% THE FALOR COMPANIES INC
8609 W BRYN MAWR AVE #209
CHICAGO IL 60631

**Legal Description :**
ALTON BEACH 1ST SUB PB 2-77
S12.65FT OF LOTS 7 & 14 & ALL OF
LOTS 5 & 6 & 15 & 16 & N1/2 OF
LOTS 4 & 17 BLK 56

To view  2007 Tax Notice/Memorandum click here

**Amounts due if paid by 05/31/2008 in U.S. funds**

| 2007  Taxes | $ 1649615.18 |
|---|---|

If payment is not received by the specified date the total amount due is subject to change.

E-check payment option is not available for properties with tax bills greater than $200,000.00. Please call (305) 270-4916 for assistance.

Amounts due are subject to change without notice.

### Contact Information

E-Mail:
proptax@
miamidade.gov

(305) 270-4916

Downtown Office:
140 W Flagler St.,
Room 101
Miami, FL 33130

South Miami-Dade
Office:
10710 SW 211 St,
Room 104
Miami, FL 33189
------------
Office Hours:
Mon - Fri
8:00 am - 5:00 pm

### Related Links:
Tax Collector
Property Appraiser
Florida State Dept of
Revenue ◆

Property Tax Home | Real Estate Tax Info | 2007 Taxes | Prior Years | 2007 Non-Ad Valorem
2007 Back Assessments | 2007 Enterprise Folio | 2007 Historical Abatements | 2008 Quarterly Payments |
2007 Tax Notice/Memorandum

Miami-Dade Home | Using Our Site | About | Phone Directory | Privacy | Disclaimer

http://egvsys.miamidade.gov:1608/wwwserv/ggvt/txcaw01.dia?folio=0232401909960

Page 1 of 2

4/15/2008

Miami-Dade County. Real Estate Tax Information

© 2002 Miami-Dade County.
All rights reserved.

E-mail your comments, questions and suggestions to Webmaster

http://egvsys.miamidade.gov:1608/wwwserv/ggvt/txcaw01.dia?folio=0232340190960

4/15/2008

Miami-Dade County. Real Estate Tax Information



**Real Estate Tax Information**
**miamidade.gov**

**Show Me:**
Property Taxes

**Search By:**
Select Item

**Detail Tax Information:**
Real Estate Tax Info
2007 Taxes
Prior Years Taxes
Due
2007 Ad Valorem
2007 Non-Ad Valorem
2007 Back Assessments
2007 Enterprise Folio
2007 Historical Abatements
2008 Quarterly Payments
2007 Tax Notice/Memorandum

# 2007 COMBINED TAX MEMORANDUM NOTICE
## NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS

**Owner's name & billing address:**
ROYAL PALM HOTEL PROP LLC
% THE FALOR COMPANIES INC
8609 W BRYN MAWR AVE #209
CHICAGO IL
60631

for a change of billing address form click here

| FOLIO NUMBER | MUNICIPALITY | MILL CODE | ASSESSED VALUE |
|---|---|---|---|
| 02 3234019096 0 | MIAMI BEACH | 0200 | 79,385,373 |

**Property address:**
1545 COLLINS AVE

**Exemptions:**
NONE

## Ad Valorem Taxes

| Taxing Authority | Millage rate per $1,000 of Taxable Value | | Taxes Levied |
|---|---|---|---|
| **Miami-Dade School Board** | | | |
| SCHOOL BOARD OPERATING | 7.57000 | 79,385,373 | 600947.27 |
| SCHOOL BOARD DEBT SERVICE | .37800 | 79,385,373 | 30007.67 |
| **State and others** | | | |
| FLORIDA INLAND NAVIGATION DISTRICT | .03450 | 79,385,373 | 2738.80 |
| SOUTH FLORIDA WATER MGMT DISTRICT | .53460 | 79,385,373 | 42439.42 |
| EVERGLADES CONSTRUCTION PROJECT | .08940 | 79,385,373 | 7097.05 |
| CHILDRENS TRUST AUTHORITY | .42230 | 79,385,373 | 33524.44 |
| **Miami-Dade County** | | | |
| COUNTY WIDE OPERATING | 4.57960 | 79,385,373 | 363553.25 |
| COUNTY WIDE DEBT SERVICE | .28500 | 79,385,373 | 22624.83 |
| LIBRARY DISTRICT | .38420 | 79,385,373 | 30499.86 |
| **Municipal Governing Board** | | | |
| CITY OF MIAMI BEACH OPERATING | 5.65650 | 79,385,373 | 448963.98 |
| CITY OF MIAMI BEACH DEBT SERVICE | .24150 | 79,385,373 | 19171.57 |

## Non-Ad Valorem Assessments

| Levying Authority | Rate | Footage/Units | Amount |
|---|---|---|---|

Miami-Dade County, Real Estate Tax Information

**Combined taxes and assessments (gross amount) for 2007 : $1601568.14**

Bill Requested By: 387 WACHOVIA BANK NATIONAL #1873

Back

Property Tax Home | Real Estate Tax Info | 2007 Taxes | Prior Years | 2007 Non-Ad Valorem
2007 Back Assessments | 2007 Enterprise Folio | 2007 Historical Abatements | 2008 Quarterly Payments |
2007 Tax Notice/Memorandum

Miami-Dade Home | Using Our Site | About | Phone Directory | Privacy | Disclaimer

E-mail your comments, questions and suggestions to Webmaster

© 2002 Miami-Dade County.
All rights reserved.

http://egvsys.miamidade.gov:1608/wwwserv/ggvt/txcaw10.dia?folio=0232340190960

4/15/2008